AO 108 (Rev. 06/09) Application for a Warrant to Seize Personal Property Subject to Forfeiture AUTHORIZED AND APPROVED/DATE: **FILED**

# UNITED STATES DISTRICT COURT
### for the

MAY  9 2023

CARMELITA REEDER SHINN, CLERK
U.S. DIST. COURT. WESTERN DIST. OKLA.
BY_____,DEPUTY

WESTERN _____ DISTRICT OF _____ OKLAHOMA

| | |
|---|---|
| In the Matter of the Seizure of )<br>The cash value of the contents of Huntington National Bank )<br>Account Number XXXXX4081, )<br>in the name of Oriental Asian Buffet LLC, )<br>maintained by Huntington National Bank, )<br>5555 Cleveland Avenue, Columbus, OH 43231. ) | Case No: M-23-360-STE |

### APPLICATION FOR A WARRANT
### TO SEIZE PROPERTY SUBJECT TO FORFEITURE

I, Josh Reinsch, a federal law enforcement officer for the government, request a seizure warrant and state under penalty of perjury that I have reason to believe that the following property is subject to forfeiture to the United States of America under 18 U.S.C. § 981(b) and 28 U.S.C. 2461(c), as incorporated by 21 U.S.C. § 881(b), 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C); 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1), for violations of 21 U.S.C. §§ 841 and 881(a)(6); and 18 U.S.C. §§ 1956 and 1957:

**The cash value of the contents of Huntington National Bank Account Number XXXXX4081, in the name of Oriental Asian Buffet LLC, maintained by Huntington National Bank, 5555 Cleveland Avenue, Columbus, OH 43231.**

The application is based on these facts:

See attached Affidavit of Special Agent Josh Reinsch, of the Homeland Security Investigations, which is incorporated by reference herein.

☒ Continued on the attached sheet.

_____
*Applicant's signature*
Josh Reinsch, Special Agent
Homeland Security Investigations

Sworn to before me and signed in my presence.

Date: **May 9, 2023**

_____
*Judge's signature*

City and State:   Oklahoma City, Oklahoma

Shon T. Erwin, U.S. Magistrate Judge
· *Printed name and title*

**WESTERN DISTRICT OF OKLAHOMA**

**OKLAHOMA CITY, OKLAHOMA**

| | |
|---|---|
| **STATE OF OKLAHOMA** | ) |
| | ) |
| **COUNTY OF OKLAHOMA** | ) |

### AFFIDAVIT IN SUPPORT OF SEIZURE WARRANTS

I, Joshua Reinsch, being first duly sworn, hereby depose and state as follows:

I am a special agent ("SA") of the Department of Homeland Security ("DHS"), Immigration and Customs Enforcement ("ICE"), Homeland Security Investigations ("HSI"), and as such am an investigator or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in 18 U.S.C. § 2516.

I have been employed as a special agent with DHS/ICE/HSI since January 2010.  I am currently assigned to the HSI Office of Grand Rapids, Michigan.

During the course of my employment, I have participated in numerous drug investigations involving marijuana, cocaine, heroin, fentanyl, and methamphetamine, which have resulted in the arrests of targets, the seizure of illicit drugs and drug-related evidence, and the forfeiture of drug-related assets.  I have conducted and supervised complex financial investigations involving the trafficking of drugs and other contraband, and money laundering including the structuring, placement, and layering of large amounts of U.S. currency.  I have participated in and/or executed search and seizure warrants authorizing

the search of locations used by drug traffickers and their co-conspirators, as well as vehicles used to transport controlled substances.  Materials searched for and recovered in these locations have included controlled substances, packaging materials, scales, cutting agents, weapons, documents, and papers reflecting the identities of co-conspirators and receipts for concealed investments, and proceeds from the distribution of controlled substances.  I have personally participated in interviews of witnesses and cooperating sources regarding illegal trafficking in drugs and have read official reports of similar interviews by other officers.  I have also participated in surveillance operations, observing and recording movements of persons trafficking drugs and those suspected of trafficking drugs.

I have participated in four federal wiretap investigations throughout my career. During those wiretap investigations, I acted as a wire room supervisor, and as surveillance and operations Team Leader.  During all the above-referenced wiretap investigations, I drafted affidavits for search warrants, organized surveillance operations, interviewed suspects, and executed search warrants.  I have conducted minimization, monitoring, and summarization procedures required as part of a wiretap investigation.  I also authored numerous tracking warrants to obtain precision location information for cellular telephones. As a result, I have gained knowledge of the methods utilized by drug traffickers and other criminals to avoid detection by law enforcement.

While conducting drug investigations, I have personally interviewed confidential sources and persons involved in the distribution of illegal drugs.  I have consulted with other experienced investigators concerning the practices of drug traffickers and the best methods

2

of investigating them.  In preparing this continuation, I conferred with other Special Agents and law enforcement officers.

The facts in this Affidavit are based upon my personal observations, my training and experience, reports provided to me by other law enforcement officers, and statements made by witnesses and other concerned parties.  Since this Affidavit is being submitted for the limited purpose of establishing probable cause for the requested warrant, I have not included each and every fact known to me concerning this investigation.

## PROPERTIES SUBJECT TO FORFEITURE

The United States submits this Affidavit in support of forfeiture of the following accounts:

a.  contents of JPMorgan Chase Bank account number XXXXX5961 in the name of Gui Ming Lin, in the amount of $572,281.55, maintained by JPMorgan Chase Bank, 270 Park Avenue, New York, New York 10017 (“**Subject Account 1**”);

b.  contents of PNC Bank account number XXXXX0525 in the names of Gui Ming Lin and Li Chen, in the amount of $482,366.03, maintained by PNC Bank, 300 Fifth Avenue, Pittsburg, Pennsylvania 15222 (“**Subject Account 2**”);

c.  contents of JPMorgan Chase Bank account number XXXXX3705 in the name of Juan Lyu, in the amount of $152,558.71, maintained by JPMorgan Chase Bank, 270 Park Avenue, New York, New York 10017 (“**Subject Account 3**”);

d.  contents of Bank of America account number XXXXX1697 in the name of 274 Stirling, LLC, in the amount of $1,175,864.50, maintained by Bank of America, 100 North Tyron Street, Charlotte, North Carolina 28255 (“**Subject Account 4**”);

e.  contents of Bank of America account number XXXXX7789 in the names of Naiqing Lin and Li Lin, in the amount of $533,373.46,

maintained by Bank of America, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 5**");

f.   contents of JPMorgan Chase Bank account number XXXXX2713 in the name of JJ Gourmet Kitchen 168, LLC, in the amount of $286,244.94, maintained by JPMorgan Chase Bank, 270 Park Avenue, New York, New York 10017 ("**Subject Account 6**");

g.   contents of Huntington National Bank account number XXXXX7935 in the name of Brandon Lin, in the amount of $143,026.70, maintained by Huntington National Bank, 5555 Cleveland Avenue, Columbus, Ohio 43231 ("**Subject Account 7**");

h.   contents of Bank of America account number XXXXX0061 in the name of Brandon Lin, in the amount of $568,560.78, maintained by Bank of America, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 8**");

i.   contents of Bank of America account number XXXXX2083 in the name of Fei Xie, in the amount of $461,426.21, maintained by Bank of America Bank, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 9**");

j.   contents of Bank of America account number XXXXX4874 in the name of Fei Xie, in the amount of $783,449.69, maintained by Bank of America Bank, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 10**");

k.   contents of KeyBank account number XXXXX5358 in the name of Feilos Holdings, LLC, in the amount of $404,329.19, maintained by KeyBank, 127 Public Square, Cleveland, OH 44114 ("**Subject Account 11**");

l.   contents of JPMorgan Chase account number XXXXX7987 in the name of Daniel Walsh, in the amount of $252,875.69, maintained by JPMorgan Chase Bank, 270 Park Avenue, New York, New York, 10017 ("**Subject Account 12**");

m.   contents of Bank of America account number XXXXX4076 in the name of Daniel Walsh, in the amount of $62,975.00, maintained by Bank of America Bank, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 13**");

n.      contents of Bank of America account number XXXXX2606 in the name of Ahmed Harrold, in the amount of $91,438.56, maintained by Bank of America, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 14**");

o.      contents of Bank of America account number XXXXX2619 in the name of Ahmed Harrold, in the amount of $1,400.00, maintained by Bank of America Bank, 100 North Tyron Street, Charlotte, North Carolina 28255 ("**Subject Account 15**");

p.      contents of Huntington National Bank account number XXXXX4081 in the name of Oriental Asian Buffet, LLC, in the amount of $39,158.84, maintained by Huntington National Bank, 5555 Cleveland Avenue, Columbus, Ohio 43231 ("**Subject Account 16**");

q.      contents of Coinbase user account 55908c8362363074c0000030, in the name of Brandon Lin, in the amount of $239,171.80, maintained by Coinbase ("**Subject Account 17**");

r.      contents of Coinbase user account 5a26f99012ec1d012c735dc4, in the name of Fei Xie, in the amount of $109,298.48, maintained by Coinbase ("**Subject Account 18**");

s.      contents of Coinbase user account 6099c12fe8cbf2131eebb38f, in the name of Naigang Lin, in the amount of $12,484.79, maintained by Coinbase ("**Subject Account 19**");

t.      contents of BetMGM account mi_Brandon0395, user ID 34278986, in the name of Brandon Lin, in the amount of $10,323.48, maintained by BetMGM ("**Subject Account 20**"); and

u.      contents of DraftKings account Dragonbonus95, user ID 10377333, in the name of Brandon Lin, in the amount of $55,807.50, maintained by DraftKings ("**Subject Account 21**"),

(together, "**Subject Accounts**").

The United States further submits this Affidavit in support of forfeiture of the following vehicles:

a.      a white 2020 Ford Transit van, Vehicle Identification Number ("VIN") 1FTBW3XG7LKB42706, bearing Michigan license plate number EJH0397 ("**Subject Vehicle 1**"), currently registered to Nai Qing Lin,

5

1744 68th Street Southwest, Byron Center, Michigan 49315, which is utilized for the transportation of marijuana;

b.      a blue 2018 Chevrolet Silverado, VIN 1GC4K1EY5JF244810, bearing Michigan license plate number EKJ9067 ("**Subject Vehicle 2**"), currently registered to Naigang Lin, 1744 68th Street Southwest, Byron Center, Michigan 49315, which is utilized for the transportation of marijuana;

c.      a white 2015 BMW X5, VIN 5UXKR0C5XF0K71824, bearing Michigan license plate number EMX2607 ("**Subject Vehicle 3**"), currently registered to Ying Lin, 1744 68th Street Southwest, Byron Center, Michigan 49315, purchased, in part, with criminal proceeds;

d.      a gray 2014 Maserati Ghibli, VIN ZAM57RTA0E1077118, bearing Michigan license plate number DTX2273 ("**Subject Vehicle 4**"), currently registered to Naiyang Lin, 3040 Hamlet Circle, East Lansing, Michigan 48823, which is utilized for the transportation of marijuana and marijuana growing materials;

e.      a white 2014 Lexus ES, VIN JTHBK1GG2E2131095, bearing Michigan license plate number EHY1334 ("**Subject Vehicle 5**"), currently registered to Shujuan Yang, 8314 Greenwood Ln, Newaygo, Michigan 49337, which is utilized for the transportation of marijuana;

f.      a black 2021 Mercedes GLE, VIN 4JGFB4KBXNA815961, bearing Oklahoma license plate number MCC600 ("**Subject Vehicle 6**"), currently registered to Chang-Hu Chen and Juan Lyu, 8117 NW 84th Street, Oklahoma City, Oklahoma, purchased, in part, with criminal proceeds and used to transport drug proceeds;

g.      a white 2020 GMC Denali pickup truck, VIN 1GT49REY8LF103341, bearing California license plate number 48917K3 ("**Subject Vehicle 7**"), currently registered to Ramon Ramirez, 2508 Whipplewood Road, Atwater, California 95301, which is utilized for the transportation of marijuana;

h.      a black 2015 Dodge Ram, VIN 1C6RR7UT1FS530721, bearing Michigan license plate number EPF4772 ("**Subject Vehicle 8**"), currently registered to Jennifer Ly, 7647 Hidden Lake Dr, Hudsonville, Michigan 49426, which is utilized for the transportation of marijuana;

i.      a black 2020 Dodge Ram, bearing VIN 1C6SRFFT4LN393969, bearing Florida license plate number 42CCNG ("**Subject Vehicle 9**"),

6

currently registered Daniel Walsh, 5633 West Road, Lake Worth, Florida 00710, which is utilized for the transportation of marijuana; and

j.      a black 2013 Chevrolet Avalanche, VIN 3GNTKGE70DG314133, bearing Michigan license plate number DPV1226 ("**Subject Vehicle 10**"), currently registered to Jennifer Ly and Barry Lee Stadler, 7647 Hidden Lake Dr, Hudsonville, Michigan 49426, which is utilized for the transportation of marijuana,

(together, "**Subject Vehicles**").

## BASIS FOR SEIZURE

Pursuant to 18 U.S.C. § 981(b), property subject to forfeiture under Section 981 may be seized via a civil seizure warrant issued by a judicial officer "in any district in which a forfeiture action against the property may be filed," and may be executed "in any district in which the property is found," if there is probable cause to believe the property is subject to forfeiture.  Section 982(b)(1) incorporates the procedures in 21 U.S.C. § 853 (other than subsection (d)) for all stages of a criminal forfeiture proceeding.  Section 853(f) permits the government to request the issuance of a seizure warrant for property subject to criminal forfeiture.

This Application seeks seizure warrants under both civil and criminal authority because the property to be seized could easily be placed beyond process if not seized by warrant, as money is fungible and easily dissipated.

The United States alleges that **Subject Accounts** and **Subject Vehicles** (all together, "**Subject Properties**") are subject to forfeiture to the United States because they are properties used or intended to be used to facilitate the commission of criminal activity and because they are proceeds of unlawful drug activity or proceeds traceable to unlawful drug

7

activity in violation of the Controlled Substances Act. Specifically, the United States alleges that **Subject Properties** are forfeitable to the United States pursuant to their use and involvement in violations of 18 U.S.C. §§ 1956 and 1957 (money laundering) and 21 U.S.C. § 841 (manufacture and distribution of drugs) and 21 U.S.C. § 846 (drug conspiracy).

Title 21, United States Code, Section 841 makes it a crime for any person to knowingly possess a controlled substance with intent to distribute that controlled substance.

Title 21, United States Code, Section 846 makes it a crime to conspire to violate a provision of Title 21, that is, Section 846 provides that any person who attempts or conspires to commit any offense defined in that subchapter shall be subject to the same penalties as those prescribed for the offense, the commission of which was the object of the attempt or conspiracy.

Title 18, United States Code, Section 1956 makes it a crime for any person to engage in laundering of monetary instruments.

Title 18, United States Code, Section 1957 makes it a crime for any person to engage in monetary transactions in property derived from specified unlawful activity.

## **PROBABLE CAUSE**

Homeland Security Investigations ("HSI"), Drug Enforcement Administration ("DEA"), and Internal Revenue Service – Criminal Investigations ("IRS-CI") are presently investigating Naigang Lin ("NAIGANG") and his associates for criminal activity including money laundering and black-market marijuana distribution. NAIGANG was previously a Michigan resident but appears to have relocated to the Western District of Oklahoma. He serves as a marijuana broker, taking advantage of Oklahoma's recent influx of marijuana

cultivators – many of whom investigators have determined are violating state and federal law by selling marijuana on the black-market. Investigators believe that NAIGANG's operation is sourced by his illegal marijuana grows and that he is laundering money as well.

NAIGANG first came to the attention of HSI in September 2020 when he was found to be flying to New York City, New York, from Grand Rapids, Michigan, with $50,000.00 in U.S. currency. The ensuing investigation revealed NAIGANG's involvement in black-market marijuana distribution and led agents to identify co-conspirators, including multiple family members: NAIGANG's three brothers – Naiyang Lin ("NAIYANG"), Naiqing Lin ("NAIQING"), and Brandon Lin ("BRANDON") – as well as his mother, Li Yang ("YANG"), and father, Dong Lin ("DONG"). Agents have conducted significant physical and electronic surveillance of the organization's operations, including obtaining global positioning system ("GPS") tracking warrants for various phones and vehicles utilized by members and using cameras to surveil marijuana stash houses and illegal grow operations owned by NAIGANG and his family. To date, law enforcement has seized more than 4,000 marijuana plants from their illegal grows, more than 3,500 pounds of processed marijuana, and over $225,000.00 in U.S. currency from NAIGANG and his organization.

Agents have identified and analyzed bank accounts owned by NAIGANG and members of his organization to "funnel" or "launder" money in an attempt to conceal the sources of the funding. They accomplish this by obtaining money from other members of the organization through checks, ATM cash deposits, automated clearing house ("ACH") transfers, and peer-to-peer ("P2P") transfers using services such as Zelle, Venmo, and PayPal. Once the funds are received, they are sent out to individuals believed to be working

for the organization via P2P systems, which provides both the sender and receiver a layer of anonymity.  Once the funds arrive in the accounts, NAIGANG and members of his organization use the money to purchase assets such as real estate, vehicles, and high-end clothing and accessories.  The investigation has revealed that NAIGANG and his associates also launder funds via casinos (both licensed and unlicensed), online sports gambling through websites including DraftKings and BetMGM, and through the purchase and use of cryptocurrency such as Coinbase.

Seeking to identify legitimate sources of income for targets of this investigation, agents obtained wage and earning information from the Michigan Department of Labor and Economic Opportunity regarding claims by NAIGANG, NAIYANG, BRANDON, YANG, DONG, Chang-Hui Chen ("CHEN"), and Ahmed Harrold ("HARROLD"), which revealed the following:

a.  NAIGANG claimed only $7,500.00 in wages in the fourth quarter of 2020 and only $3,600.00 in wages in all of 2021, both from employment through Oriental Garden Buffet;

b.  NAIYANG claimed a total of $25,800.00 in wages for 2021 and only $6,600.00 in wages for 2022 for employment through Oriental Garden Buffet;

c.  BRANDON has not claimed any wages since 2017;

d.  YANG claimed only $6,095.16 in wages in 2020 for employment at Oriental Asian Buffet, a restaurant that she owns with DONG, but has not claimed any wages since;

e.  DONG claimed only $444.00 in wages in 2020 for employment at Oriental Asian Buffet, a restaurant that he owns with YANG, but has not claimed any wages since;

f.  CHEN claimed only $4,700.00 in wages for employment at Chef Chen's Buffet in 2020, but has not claimed any wages since; and

g.     HARROLD claimed only $2,003.88 in 2021 and has not claimed any wages since.

During the initial stages of the investigation, agents determined that NAIYANG owned 9460 Homerich Avenue Southwest, Byron Center, Michigan 49315 ("Property 2") in Byron Center, Michigan. Agents issued a subpoena to First American Title in May 2021 to gain information about the purchase of Property 2.  Investigators learned that a $89,756.49 check had been issued to First American Title from the account of Oriental Asian Buffet, a restaurant owned by YANG and DONG in Michigan, as part of a deposit for closing costs on Property 2.  The remaining $145,000.00 tendered was paid toward the closing costs via three separate cashier's checks: $45,000.00 from Q.W.; $50,000.00 from H.B.; and $50,000.00 from Terrance Allen ("ALLEN").[1] Analysis of the accounts of Q.W., H.B., and ALLEN demonstrates that on July 22, 2020, close in time to the closing date on Property 2, cash was deposited in each account in the amounts of $44,900.00; $50,000.00; and $50,000.00, respectively, which were then converted to cashier's checks payable to First American Title.  Investigators believe that these individuals were used as straw purchasers by NAIGANG to conceal the source of the $145,000.00 paid in cashier's checks toward the purchase of Property 2.  They advised further that based upon their training and experience, they believe that the $144,900.00 in cash provided to Q.W., H.B., and ALLEN was illegally obtained drug proceeds.

1.     Similarly, agents researched the ownership of another property associated

---

[1]     ALLEN was later identified as a courier for NAIGANG's illegal drug distribution organization.  Approximately 262 pounds of marijuana was seized from him in February 2023 during a traffic stop in Oklahoma City, Oklahoma.

with NAIGANG's organization, Property 4 in Grand Rapids, Michigan.  In response to a subpoena in May 2021 to Sun Title Agency regarding payments toward the purchase of 5500 Division Avenue South, Grand Rapids, Michigan 49548 ("Property 4"), investigators learned that Sun Title Agency received a wire transfer in the amount of $40,184.29 from N3Venture – a company owned by NAIYANG.  Closing documents indicate that a second wire in the amount of $40,000.00 was sent by an account owned by Oriental Asian Buffet – owned by YANG and DONG, NAIGANG's parents.   Investigators believe that NAIGANG and his associates used a method similar to that described in the purchase of Property 2 to conceal the source of funds to purchase Property 4, specifically funneling drug proceeds through one or both business accounts to effect the purchase of Property 4.

2.      Further, based upon information gathered during surveillance, investigators believe that Property 4 was being utilized as an illegal marijuana grow and as an illegal casino.  On multiple occasions, agents observed NAIYANG and other associates carrying in items typically used in the cultivation of marijuana, including chemicals and bamboo sticks (often used to stake plants); they also watched as large, black trash bags and moving boxes were hauled in and out of Property 4 by NAIGANG associates.  In addition, agents also observed many individuals arriving, entering the structure for various amounts of time, and then departing, many traveling in vehicles bearing out-of-state license plates.  Based upon their training and experience, their surveillance of Property 4, and their observations, investigators believe that the traffic they observed is indicative of an illegal gambling operation, marijuana cultivation, and illegal drug distribution in and from Property 4.  Information provided by several associates later in the investigation confirmed agents'

12

suspicions about gambling at Property 4; one described it as a "poker house" where NAIGANG "does all of his dealings" and another described arcade machines in the front and poker tables in the back. On June 7, 2022, a fire ignited inside Property 4, causing extensive damage. The fire marshal investigating afterward advised agents that there was marijuana cultivation equipment inside the building, however there were no plants present at the time.

3.      Investigators learned that another residence in Rockford, Michigan – 5189 Bonasa Drive Northeast, Rockford, Michigan 49341 ("Property 5") – was purchased by NAIGANG in January 2021. According to closing documents received from Chicago Title, N3Venture issued a check through Capitol National Bank for $3,000.00 payable to Bellabay Realty for the earnest money deposit. In addition, Chicago Title received a cashier's check from David A. Smith ("SMITH") through Bank of America in the amount of $72,486.67 for closing. SMITH was identified through the course of the investigation as an associate of NAIGANG. According to Bank of America, the cashier's check was purchased in cash and, because SMITH's name was on the check, he would have had to have been the purchaser. Given Property 5's role in NAIGANG's drug trafficking organization, investigating agents believe that NAIGANG either directly or indirectly, through associates, gave SMITH cash and directed SMITH to purchase the cashier's check to conceal the source and ownership of the illicit funds

4.      The investigation has further revealed that NAIGANG's organization utilizes Property 5 as a stash house. On May 15, 2021, agents conducting surveillance there observed two rental vehicles in the driveway. Amy Nguyen ("NGUYEN") arrived driving

a third rental vehicle and entered the residence.  Later, she, NAIGANG, Fei Xie ("XIE"),[2] C.Z., and F.Z. exited Property 5.  NGUYEN and XIE were carrying two black and yellow tote containers, which they placed in the back of NGUYEN's rental vehicle before NGUYEN entered the driver's seat.  NAIGANG and C.Z. got into another vehicle and XIE into a third, then all three vehicles departed Property 5.  Law enforcement conducted a traffic stop on NGUYEN's vehicle and a consent search yielded 28 pounds of marijuana concealed in the two totes.  While NGUYEN was in investigative detention, officers allowed her access to her phone in order to obtain phone numbers.  When she unlocked it, law enforcement observed that the most recent text message was from (908) 935-8888 ("Phone A") – a number associated with NAIGANG – and read "5500 Division" – which is the address of Property 4.  Investigators believe, based upon their training and experience, that NGUYEN was directed by NAIGANG to deliver the marijuana in the totes to Property 4 for further distribution.

5.    Agents analyzing the personal Chase Bank account of NAIGANG's putative spouse, LYU, noted that a $10,000.00 cashier's check was sent from the account to Sun Title Agency.  The agent issued a subpoena seeking information associated with the payment.  In response to the subpoena, in July 2021, they received closing documents for the purchase of another property owned by NAIGANG in Grand Rapids – 5253 Division

---

[2]    XIE is identified in the Quitclaim Deed as the general manager of 1400 Sunset, LLC, the owner of 1406 Sunset Avenue, Lansing, Michigan 48917 ("Property 3").  The previous owner of the Property 3, Feilos Holding, LLC, also identified XIE as its general manager.  XIE was stopped in January 2021 by Transportation Safety Administration ("TSA") agents at Grand Rapids International Airport carrying $25,000.00 in cash, which he claimed was proceeds from the sale of a BMW – for which he produced what appeared to be a fraudulent insurance card.

Avenue South, Grand Rapids, Michigan 49548 ("Property 6") – which indicated that the

$10,000.00 cashier's check was an earnest money deposit. The remaining balance for the

purchase of the property was paid as follows:

a.      a $20,000.00 cashier's check from the Chase Bank account of J.R.;[3]

b.      a $8,713.21 cashier's check from Horizon Bank remitted by NAIGANG – funded by a $9,000.00 cash deposit also by NAIGANG;

c.      a $10,000.00 cashier's check from Huntington Bank remitted by NAIGANG funded by two (possibly structured) cash deposits in the amounts of $9,150.00 and $2,550.00; and

d.      a $100,000.00 cashier's check from Consumers Credit Union remitted by NAIGANG funded by multiple structured cash deposits, as well as check deposits from a nail studio and various known associates of NAIGANG's organization.

Based upon their training and experience, agents believe that NAIGANG used proceeds of

his illegal marijuana distribution operation to purchase Property 6. In addition, agents

confirmed later in the investigation that Property 6 was also utilized by the organization for

the cultivation, processing, and storage of illegal marijuana.[4]

6.      Investigators learned through closing documents that an industrial-style

building at 1718 Broadmoor Street, Muskegon, Michigan 49442 ("Property 7") was

---

[3]      Analysis of J.R.'s account indicates that he was reimbursed through a cash deposit several days after the cashier's check was remitted. J.R. was observed transporting a moving box for NAIGANG out of Property 4, which agents have advised is a manner in which NAIGANG transports marijuana.

[4]      On March 8, 2022, law enforcement executed a search warrant at Property 6. Inside, agents discovered approximately 40 pounds of marijuana, dried marijuana plants hanging in several rooms, marijuana cultivation supplies, a room equipped for processing marijuana, and utility bills for Property 5. They also located black and yellow tote bags matching those described *supra* (see paragraph 31) used to transport marijuana for NAIGANG.

purchased by NAIGANG in April 2021 by means of a land contract.[5]  The Huntington Bank account of Oriental Asian Buffet – the restaurant owned by NAIGANG's parents, YANG and DONG – remitted a $1,000.00 check payable to Bellaby Realty for the earnest money deposit.  The remaining $60,000.00 was paid in cash by NAIGANG.  Agents believe that NAIGANG utilized proceeds from the sale of marijuana to purchase Property 7 and further, that this transaction provided a means to launder his illicit proceeds, particularly through the use of a land contract and a cash payment.

7.      Investigators discovered "Property 8" – 2866 Turtlecreek Drive, East Lansing, Michigan 48823 – by inquiring with the Michigan Department of Licensing and Regulatory Affairs ("MDLRA") about businesses owned by NAIYANG.  The MDLRA indicated that NAIYANG's business, N3Venture, is registered to Property 8.  Notably, N3Venture is also the entity that owns Property 4 and furnished the earnest money, a $3,000.00 check, for the purchase of Property 5.

8.      On August 5, 2021, investigators surveilled NAIGANG as he traveled in a Chevrolet Silverado – **Subject Vehicle 2** – from Grand Rapids, Michigan, to Property 8 in East Lansing, Michigan.  Upon arrival, NAIGANG entered Property 8 and remained inside for approximately ten minutes before departing.  Agents then followed NAIGANG to the residence of an associate, M.N. located at 3945 Winward Drive, Lansing, Michigan, where

---

[5]      Use of a land contract allows the buyer and seller to agree to terms of payment which are solely between the parties.  This type of purchase can allow the buyer to pay cash directly to the seller, thus allowing the buyer to avoid the banking system and making it more difficult for law enforcement to trace the source of the funds.  NAIGANG and his associates utilized land contracts for the purchases of Target Properties 1, 4, 5, 7, and 8.

NAIGANG entered the residence and met with M.N. After approximately 20 minutes, NAIGANG exited the residence carrying a large trash bag that appeared, by the manner in which he was carrying it, to be heavy, placed it in his truck, and departed. As NAIGANG arrived back in the Grand Rapids area, law enforcement conducted a traffic stop on his Silverado. NAIGANG refused to consent to a search of the vehicle, but the trooper observed a large trash bag on the back seat and a smaller trash bag on the floor of the passenger seat. When asked what was in the bags, NAIGANG stated that he had been in Lansing doing laundry at a family member's house. NAIGANG was subsequently released and traveled to 1744 68th Street Southwest, Byron Center, Michigan 49315 ("Property 1"). Based upon previous information gathered through surveillance over time, as well as seizures conducted during this investigation, investigators believe that NAIGANG was picking up marijuana from both Property 8 and MINH's residence, as marijuana previously seized from members of his organization has been transported in similar large trash bags. A search warrant executed on February 16, 2022, revealed that Property 8 was also utilized by NAIGANG's operation as an illegal marijuana grow.

9.     On October 6, 2021, law enforcement executed a search warrant at Property 2 – a residence previously identified has having been purchased by NAIGANG's brother NAIYANG.[6] During the execution of the warrant, officers located an illegal indoor marijuana grow, resulting in the seizure of approximately 3,030 marijuana plants and

---

[6]     Further investigation revealed that that although electric utilities for Subject Property 2 are registered to "Jason Lee" using nailin0219@yahoo.com, that email address has been used by NAIGANG on other financial documents.

approximately 42 pounds of processed marijuana.

10.     During the execution of the search warrant at Property 2, law enforcement encountered four Mexican nationals who arrived at the residence in a Honda Odyssey van bearing a Michigan license plate. Database checks indicate that this vehicle is registered to NAIGANG. All four Mexican nationals were interviewed separately on scene; each of them admitted to having being hired by NAIGANG and his mother, YANG, whom they identified as "Lilly." Each indicated that they were farmers, there to grow and process marijuana, and that they delivered marijuana bi-weekly to Property 1. All four consented to searches of their phones and identified the numbers through which they contacted NAIGANG; specifically, one of the individuals identified (616) 606-2484 ("Phone B") as NAIGANG's phone number.[7]

11.     NAIGANG's family primarily stays at Property 1 when they are in Michigan, but also appear to be using the residence as a meeting place for couriers and as a stash house, storing illegal marijuana intended for further distribution. Specifically, agents have observed NAIGANG and his associates exiting the house with large, black trash bags and moving boxes, loading them into various vehicles. During ongoing surveillance of Property 1, agents have observed activities indicative of illegal distribution of marijuana, including the following:

        a.      On August 31, 2021, NAIGANG exited Property 1 carrying a large, black trash bag, which he placed into the trunk of a white Chevrolet Camaro before traveling to 5378 Ivanrest Ave Southwest, Wyoming, Michigan. Based upon the manner in which he was carrying it, the bag appeared to investigators to be heavy.

---

[7]     Investigators applied for and were granted a warrant for Phone B's GPS data.

    b.     On December 20, 2021, NAIGANG, HARROLD, and R.Z. stood outside of Property 1 as a red Chrysler van bearing a California license plate arrived, driven by N.P.[8] NAIGANG and R.Z. opened the tailgate of R.Z.'s nearby Chevrolet Tahoe. N.P. retrieved two large moving boxes from the Chrysler van and placed them in the trunk of the Tahoe, after which the Tahoe departed.[9]

    c.     On January 19, 2022, HARROLD arrived at Property 1, removed two large Home Depot moving boxes from the garage, and placed them into a maroon Chevrolet Impala. During a subsequent traffic stop on the vehicle, law enforcement located moving boxes and several black trash bags, all of which contained marijuana; a total of 26.04 kilograms was seized.

    d.     On February 2, 2023, NAIGANG and CHEN exited Property 1 carrying three large, black trash bags, which they placed into CHEN's white Lexus sedan.

Investigators believe, based upon their training and experience, that in each of these instances, the large, black trash bags and moving boxes stored at Property 1 contained illegal marijuana destined for further distribution by NAIGANG and his criminal organization.

12.    On February 16, 2022, law enforcement executed search warrants on three additional premises that investigators determined were owned and/or frequented by NAIGANG, specifically: (1) 3040 Hamlet Circle, East Lansing, Michigan ("Hamlet Circle Residence"); (2) Property 3; and (3) Property 8. Law enforcement located 85.25 pounds

---

[8]    HARROLD and N.P. have been identified as couriers for the NAIGANG organization. Investigators determined that N.P. rented the Chrysler van from a business located at Will Rogers Airport in Oklahoma City, Oklahoma, on December 13, 2021. GPS location information from Phone A indicates that NAIGANG was in Oklahoma City at the airport at the time that the vehicle was rented as well.

[9]    Although officers with the Wyoming (Michigan) Police Department subsequently performed a traffic stop on the Tahoe, they did not obtain consent to search and the vehicle was released. Based upon their training and experience, investigators believe that the two moving boxes contained marijuana that originated in Oklahoma City.

of illegal processed marijuana at the Hamlet Circle Residence; 1,079 illegal marijuana plants at Property 3; and 119.37 pounds of illegal processed marijuana at Property 8. During the execution of the search warrant at Property 8, law enforcement encountered one of the four Mexican nationals who were present during the execution of the search warrant at Property 2. He indicated after the raid of Property 2, he moved to Property 8 and that NAIGANG, YANG, and ZHENG were his bosses. The farmer also advised that NAIGANG wanted him to move to Oklahoma to work for him there since the marijuana grows there were larger.

13. GPS location information from Phone B indicates that NAIGANG moved to Oklahoma City, Oklahoma, in February 2022. NAIGANG appears to have begun running Private Kitchen, a restaurant in Oklahoma City, at approximately the same time. The investigation as revealed that NAIGANG uses Private Kitchen as place to meet with associates and to consolidate and process proceeds from the illegal distribution of marijuana. Agents have frequently seen NAIGANG and his associates coming and going from Private Kitchen, often carrying backpacks, boxes, and luggage. Based upon their training and experience, investigators believe that this activity is indicative of the aggregation of drugs and/or drug proceeds at this location; specifically, they note that restaurant patrons do not typically carry such items into restaurants when visiting for meals.[10]

---

[10] For example, on December 21, 2022, agents surveilling individuals at Private Kitchen observed NAIGANG grab a brown bag from an associate inside the restaurant, pull out what appeared to be large stacks of currency and lay them on a table. He then appeared to photograph it and appeared to count it before departing with the money in his jacket pockets. Investigators believe, based upon their training and experience, that this

14.     Agents continued to surveil NAIGANG as he established himself in Oklahoma City.  In March 2022, HSI agents observed NAIGANG meeting with Barry Stadler ("STADLER") at Private Kitchen.  On April 21, 2022, STADLER was arrested in West Virginia after the vehicle he was driving, a van registered to NAIQING was found to contain 430 pounds of marijuana.[11]  During the two days prior to his arrest, STADLER used Phone C to communicate with NAIGANG via Phone A approximately 80 times.

15.     American Airlines records indicate that on May 12, 2022, NAIGANG flew from Oklahoma City to Washington, D.C.  While in Washington, NAIGANG rented a grey Chevrolet Tahoe with a Georgia license plate.  On May 13, 2022, GPS data from Phone A demonstrates that NAIGANG drove from Washington, D.C., to New York City.   Two days later, GPS data from Phone A indicated that NAIGANG drove to Illinois, where he stayed for only a few hours before traveling to Michigan, specifically to Property 1.  Agents arrived there shortly thereafter and observed NAIGANG driving the Tahoe.

16.     At approximately 11:00 p.m. on May 16, 2022, location information from Phone A indicates that NAIGANG departed Property 1, heading southbound, and by the morning of May 17, 2022, GPS data indicated that he was in Missouri, traveling south toward Oklahoma.  Agents located NAIGANG as he entered Oklahoma City, conducting a traffic stop after they observed the grey Tahoe traveling too closely to other vehicles and

---

currency consisted of proceeds of a specified unlawful activity, particularly marijuana trafficking.

[11]     At this point in the investigation, agents had obtained a warrant for the GPS location data from both NAIGANG's phone number, (908) 935-8888 ("Phone A"), and from STADLER's phone number (616) 734-5425 ("Phone C"), as well as authorization to install a GPS tracking device on **Subject Vehicle 10**.

making two lane changes without signaling prior.  During the stop, NAIGANG was identified as the sole occupant of the vehicle.  Agents observed bulges in his pants which were determined to be large, folded stacks of U.S. currency.  When asked about the money, NAIGANG stated that he and his friend had come into Oklahoma City the night before and were going to close on a house.  An agent inquired further and NAIGANG stated that he was coming from "the restaurant in Chinatown," which was inconsistent with his direction of his travel.  The agent asked again, but NAIGANG could not explain his route.

17.     Law enforcement deployed a K9 for an open-air sniff of the vehicle, which yielded a positive alert.  NAIGANG was detained.  When asked if there were any drugs in the vehicle, NAIGANG indicated there were not.  When asked if there was a large amount of currency, NAIGANG stated there was $90,000.00 in the vehicle from his restaurant and that it was going to be used to buy a house.  A probable search of the vehicle revealed $90,000.00 in U.S. currency in a green bag and bundled in stacks with rubber bands, poker tables, boxes of dominos and playing cards, a notebook that appeared to contain ledgers of large amounts of money, three cell phones, and yet-unused vacuum-seal bags.  During the search, the agents noticed that one of the phones in the vehicle displayed a GPS, which showed that the vehicle had traveled from Vinita, Oklahoma, in the northeast part of the state, contradicting NAIGANG's claim that he was coming from Chinatown in Oklahoma City.  After the search, NAIGANG was released; the $90,000 and vacuum-sealed bags were seized by law enforcement.

18.     Although NAIGANG and his associates established themselves in Oklahoma, his organization continued to operate in Michigan and has expanded to

22

Mississippi as well. Two additional properties – 2653 Sycamore River Drive, Unit 192, Fowlerville, Michigan ("Property 9") and 274 Stirling Drive, Starkville, Mississippi 39759 ("Property 10") were purchased in 2022 by S.Y.L. and LYU (through 274 Stirling, LLC) respectively – however, closing documents and financial analyses of both purchases indicate that illicit funds from the 274 Stirling, LLC, Bank of America business account were used to purchase both Property 9 and Property 10.

19.     LYU, NAIGANG's putative spouse, opened an account for 274 Stirling, LLC, at Bank of America on April 28, 2022. According to the opening documents, LYU is the only signatory on the bank account and 274 Stirling, LLC, was formed in Mississippi with LYU as its registered agent. A search of the Mississippi Secretary of State website indicates that the business was formed on April 18, 2022, ten days prior to the opening of the account. Notably, NAIGANG often traveled to Starkville prior to the formation of 274 Stirling, LLC. Investigators advised that based upon their training and experience, it is common for money launderers to establish LLCs that serve no real purposes and then to open a corresponding bank account through which to launder funds an attempt to legitimize the money.

20.     LYU indicated in the business formation documents that the address of the 274 Stirling, LLC, is Property 10 in Starkville, Mississippi; however, she identified her address in the Bank of America account documents as 8117 NW 84th Street, Oklahoma City, Oklahoma – the residence that she shares with NAIGANG.

21.     From the date of the account's establishment on April 28, 2022, through February 14, 2023, approximately $589,637.20 was deposited into the account and

approximately $586,227.30 was expended or withdrawn. The account was originally funded by two checks: the first in the amount of $12,938.00 from a business identified as Hi Bus, Inc., and the second a $20,000.00 cashier's check remitted by H.H. from Norman, Oklahoma.

22.     From May 2, 2022, through May 18, 2022, LYU's Bank of America account activity consisted of the following:

      a.     on May 2, 2022, $180,000.00 was deposited into the account via a counter credit funded by two instruments: an $81,000.00 check from CIB Consulting, Inc. (located in Bayside, New York) and a $99,000.00 check from SCY Realty Team Corp. (also located in Bayside, New York);

      b.     on May 4, 2022, $150,000.00 was deposited into the account through a domestic wire from CIB Consulting, Inc.;

      c.     on May 4, 2022, $50,000.00 was deposited into the account through a counter credit in Syosset, New York, funded by a check from HBA Asian Service, Inc.;

      d.     on May 5, 2022, $14,226.00 was transferred via ACH to New York Life Insurance;

      e.     on May 9, 2022, $5,000.00 cash was withdrawn via a teller transaction at a Bank of America branch in Oklahoma City;

      f.     on May 10, 2022, $35,000.00 cash was deposited via a counter credit transaction at a Bank of America branch in Oklahoma City;

      g.     on May 10, 2022, $375,962.26 was wired to Brown, Langston, and Taylor, in Tupelo, Mississippi, for the purchase of Property 10;[12] and

      h.     on May 18, 2022, $50,000.00 was transferred via a teller to K.W.H. in San Jose, California.

---

[12]     Brown, Langston, and Taylor, a law firm in Tupelo, Mississippi, handled the sale of Property 10 for the transferor.

23.     On June 13, 2022, LYU made two cash deposits into Stirling LLC's Bank of America account in Oklahoma City: the first was in the amount of $3,220.00 through a teller, and the second was in the amount of $2,780.00 via an ATM – which LYU can be seen on video surveillance retrieving from a brown paper bag.  These deposits were in turn utilized to transfer money to an unknown account, to facilitate a Zelle payment to an individual named "Saren," and for multiple Southwest Airlines ticket purchases.

24.     On June 28, 2022, $20,000.00 was transferred into the 274 Stirling, LLC, Bank of America account via teller transaction at a North Carolina branch from the Bank of America account of Daniel Walsh ("WALSH").   When WALSH was arrested approximately six months later, law enforcement observed text messages in his phone wherein NAIGANG instructed WALSH to deposit money into WALSH's account and to send it to "yuanyuan," whom agents identified as Juan LYU.  WALSH also indicated in these texts that he was tired of being tricked into laundering money for NAIGANG.

25.     On July 25, 2022, NAIGANG was recorded on bank video surveillance making two cash counter credit deposits into the 274 Stirling, LLC, Bank of America account: one in the amount of $61,000.00 and the second in the amount of $39,000.00.  On the video, NAIGANG can be seen pulling large stacks of U.S. currency from his backpack to complete the deposits.  After these transactions, $100,000.00 was wired from the Bank of America account to First American Title for the purchase of Property 9.  Closing documents obtained from First American Title for Property 9 indicate that the remainder of the funds used to purchase the property were remitted in the form of a cashier's check in the amount of $121,777.01 from S.Y.L.'s Chase Bank account and a $60,000.00

cashier's check remitted by S.Y.L. from her Bank of America account.[13]

26.     Based upon the transactional activity in the 274 Stirling, LLC, Bank of America account and both S.Y.L.'s Bank of America and Chase Bank accounts, investigators believed that NAIGANG and LYU established the 274 Stirling, LLC, Bank of America account for the sole purpose of laundering funds for NAIGANG'S criminal organization. The illicit funds were in turn used for the purchase of Property 9 and Property 10.

27.     On December 19, 2022, an Oklahoma Highway Patrol ("OHP") trooper conducted a traffic stop on a vehicle (**Subject Vehicle 9**) driven by WALSH on I-40 in Sequoyah County, Oklahoma, during which approximately 262 one-pound bundles of marijuana were seized.  WALSH waived his rights under *Miranda* and spoke with troopers after the stop.  During the interview, he confirmed that he worked as a drug courier for a large-scale marijuana distributor based in Oklahoma City and that he had been transporting bulk amounts of marijuana for the last six to seven months, making approximately two to four trips a month.  He advised that while most of it came from grows in Oklahoma, he would sometimes pick up marijuana from California, Georgia, and Michigan and bring it to Oklahoma for redistribution.  WALSH stated that on this trip, he had been driving to

---

[13]     Financial analysis of S.Y.L.'s Chase Bank account indicates that $52,000.00 of the $121,777.01 was funded by two checks from two different individuals located in Blaine, Minnesota.  Financial analysis of S.Y.L's Bank of America account indicates that the $60,000.00 cashier's check was partially funded by an ATM cash deposit for $1,460.00; a $10,000.00 cashier's check from M.Z.; a $10,000.00 check from W.Y. (whose address indicates a residence in Blaine, Minnesota); two $5,000.00 checks from Y.J.L. and Z.B.Z. (both of whom reside in Wisconsin), and $3,500.00 transferred from SAI's savings account.

Florida. When asked to identify for whom he was working, WALSH stated that they were Asian and that one of his employers had sent him a Zelle payment. WALSH stated he often met his employers at a Chinese restaurant in Oklahoma City's Asian District.[14]

28.     Financial analysis of WALSH's Chase Bank account ("**Subject Account 12**") indicates that on June 2, 2022, he received a $1,000.00 Zelle payment from a Chase Bank account ("**Subject Account 1**") registered to G.M.L., NAIGANG's grandfather. While G.M.L. owns the account, bank surveillance video demonstrates that NAIGANG makes deposits and controls the account. Records also show that on November 28, 2022, WALSH's **Subject Account 12** received a $650.00 Zelle payment from **Subject Account 1**.

29.     GPS location data from NAIGANG's Phone B and on Walsh's phone ("Phone D") on December 19, 2022, indicate that beginning in the early morning hours of December 19, 2022, Phones B and D were in close proximity in three different places: Private Kitchen; a location in Norman, Oklahoma; and an area near Lake Overholser in Oklahoma City. According to the GPS location information, after Phones B and D were located together near Lake Overholser, WALSH's Phone D began to move southbound out of the city into rural areas while Phone B traveled to Norman – remaining there for a brief time before returning to Oklahoma City. Investigators believe, based upon their training and experience, that the GPS data from Phones B and D show NAIGANG and WALSH meeting to coordinate the pickup of 262 pounds of marijuana with which WALSH was stopped with just hours later on the night of December 19, 2022.

---

[14]     Investigators believe that WALSH was referencing meetings at Private Kitchen.

30.     As the investigation progressed, law enforcement observed NAIGANG and LYU utilizing a black 2021 Mercedes GLE ("**Subject Vehicle 6**") registered to both LYU and CHEN, for which agents received authorization to affix a GPS tracking device.  The tracking device was installed while **Subject Vehicle 6** was parked in the driveway of the residence that NAIGANG and LYU share at 8117 NW 84th Street, Oklahoma City, Oklahoma 73132.  On February 13, 2023, at approximately 12:56 a.m., **Subject Vehicle 6** departed 5800 Sanabel Court, Oklahoma City, Oklahoma 73179 ("Sanabel Residence"), a suspected marijuana stash house used by the NAIGANG organization, and began to travel eastbound out of state.[15]  At approximately 11:13 a.m. the same day, indicating a focused path of travel with minimal stops, GPS tracker data indicates that **Subject Vehicle 6** stopped at or near a residence located at 49 Pointe Drive, Starkville, Mississippi.  The vehicle remained at this location for approximately 12 minutes before departing, appearing to travel back toward Oklahoma.

31.     As law enforcement trailed **Subject Vehicle 6** while it traveled through Union County, Mississippi, the driver failed to maintain its lane, for which a Mississippi Highway Patrol (MHP) trooper initiated a traffic stop on the vehicle.  Upon approaching the **Subject Vehicle 6** and explaining the reason for the stop, the trooper observed that the driver was visibly nervous and that his hands were shaking.  The driver presented a Connecticut driver's license and was identified as XIAO; the front seat passenger was later

---

[15]     The investigation has revealed that Meiyan Xiao ("XIAO") lives at the Sanabel Residence.  Agents have observed that consistently, vehicles arrive and back into the garage where they remain for approximately one or two minutes before departing.  Investigators have advised that based upon their training and experience, this pattern of activity is indicative of individuals either delivering or picking up drugs or proceeds.

identified as CHEN. As the trooper waited for XIAO to obtain the vehicle's insurance information, XIAO kept asking if he could call someone. The trooper denied the request and asked him to exit **Subject Vehicle 6**. As he did so, the trooper asked XIAO from where they were coming, to which XIAO replied, "Memphis." As the trooper brought XIAO to his patrol unit, he asked again from where they were traveling. This time, XIAO responded, "Alabama," but he could not name a specific town or city. During this interaction, XIAO appeared nervous and consistently looked at CHEN.

32. XIAO provided consent to search **Subject Vehicle 6**, pursuant to which the trooper located a black bag. When the trooper asked XIAO and CHEN about its contents, both men indicated that they did not know what was in it; however, inside, the trooper located two plastic bags of bundled U.S. currency totaling approximately $121,650.00. Law enforcement seized the money as well as iPhones from each of the men – a gold one from CHEN and a black one from XIAO.[16]

---

[16] CHEN identified his phone number – associated with the gold iPhone – as (231) 245-8483. Toll analysis of NAIGANG's multiple phones indicates that from May 16, 2021, through February 13, 2023, NAIGANG was in contact with (231) 245-8483 approximately 1,014 times. Investigators further corroborated that this number belongs to CHEN, noting that he provided it on JPMorgan Chase loan documents for the black Mercedes.

XIAO did not agree to interview with investigators, however, investigators determined from a review of subscriber information that the phone number associated with the black iPhone seized from him is (405) 428-6175. Toll analysis of multiple phone numbers utilized by NAIGANG indicates that from November 15, 2021, through February 13, 2023, NAIGANG was in contact with phone number (405) 428-6175 approximately 2,308 times. Moreover, physical surveillance of NAIGANG over the past month indicates that NAIGANG, XIAO, and CHEN are together on an almost daily basis.

CHEN waived his rights under *Miranda* and agreed to speak with investigators, however, agents believe that CHEN was untruthful and was attempting to cover up his and XIAO's involvement in NAIGANG's marijuana trafficking organization.[17] Agents advised that it is significant that XIAO and CHEN were stopped driving a vehicle utilized by NAIGANG, and that they departed from NAIGANG's stash house, the Sanabel Residence, to begin their journey. This fact, paired with toll analysis demonstrating frequent communication and the approximately $121,650.00 in U.S. currency seized, lead investigating agents to believe that XIAO and CHEN were picking up drug proceeds in Starkville, Mississippi, at NAIGANG's behest.

## SUBJECT ACCOUNTS

**Subject Account 1** was opened through JPMorgan Chase was opened on March 28, 2020, by G.M.L., NAIGANG's grandfather. From January 4, 2021, through December 29, 2022, approximately $284,298.23 entered the account and approximately $287,983.32 exited the account. **Subject Account 1** was primarily funded by ATM cash deposits in New York, Georgia, Oklahoma, Michigan, and South Carolina. Video surveillance demonstrates that NAIGANG made the cash deposits. The account was also heavily funded by P2P payments from various known and unknown individuals.

---

[17] During the interview, CHEN stated that he lived in Michigan, but recently traveled to Oklahoma and then to Mississippi. When asked where he and XIAO had been the day prior to the traffic stop, CHEN replied they had just been looking around. CHEN could not name where in Mississippi they had been. He also stated that he had operated restaurants in Michigan for the past ten years. When asked about the money, CHEN stated that it was going to be used to purchase a house. However, investigators have not identified any houses that he owns nor restaurants he operates in Michigan. In fact, agents believe that CHEN is residing in Oklahoma and has been for the past several months.

**Subject Account 1** debits are primarily through airline purchases, ATM/teller withdrawals, casino transactions, payments to various credit cards held by NAIGANG, and P2P payments to various known (couriers such as STADLER and WALSH) and unknown individuals. **Subject Account 1** was used to transfer $43,000.00 via Zelle to B.Z., whom agents identified as the person from whom NAIGANG's family purchased Property 1. Since the investigation has revealed that that NAIGANG, nor his family members, have claimed no legitimate income, it is my belief that the funds deposited into the **Subject Account 1** are illicit proceeds from NAIGANG's criminal organization, which are then used to pay members of the organization, make payments for real estate, or are utilized for personal purchases such as casinos or travel. I also believe **Subject Account 1** is being used to facilitate drug trafficking.

**Subject Account 2** was opened at PNC Bank on November 4, 2011, by G.M.L. and L.C., NIAGANG's grandfather and grandmother. From January 9, 2020, through February 9, 2023, approximately $245,232.47 entered the account and approximately $241,824.98 exited the account. **Subject Account 2** was primarily funded by cash deposits ($122,785.56), a mixture of check and cash deposits, and reverse check deposits. The primary debits to the account included payments to various credit cards, issuances of checks, and payments to entities such as New York Life Insurance and energy companies.

On January 24, 2020, a $44,000.00 check was issued from **Subject Account 2** to Nesson Cable TV Electronic Services, Inc., for 1400 Sunset Avenue, however, the check was returned to the account on January 27, 2020. The investigation has revealed that Nesson Cable TV Electronic Services, Inc., was the seller of Property 3. Law enforcement

discovered that this property was an illegal marijuana grow during a search warrant executed in February 2022. (*See* ¶ 32.) Once the check was reversed back into the account, $44,000.00 in cash was deposited into **Subject Account 2**. Other transactions through **Subject Account 2** include cash deposits and payments to Capital One and Brooks Brothers credit cards. Other cash deposits into **Subject Account 2** funded payments to utility companies such as Consumer's Energy and the Lansing Board of Water and Light for utilities at properties that law enforcement later determined through search warrants were illegal grows. On February 12, 2020, a check for $8,000.00 was issued from **Subject Account 2** to NAIGANG with the memo "loan to grandson." A day later, a second check to NAIGANG was issued for $10,000.00. On April 16, 2020, a check issued to NAIGANG was deposited into **Subject Account 1** in the amount of $1,750.00 from D.H., a known associate of NAIGANG's family. These transactions lead me to believe that as with **Subject Account 1**, NAIGANG was utilizing **Subject Account 2** to launder funds even though the accounts are in his grandfather's name. The account is primarily funded by cash deposits, concealing the source of the funds, and then were used to move money to other unknown accounts and to make payments for an illegal grow at Property 3.

**Subject Account 3** was opened at JPMorgan Chase Bank on November 13, 2020, by LYU, NAIGANG's putative spouse. From November 13, 2020, through March 9, 2023, approximately $69,463.81 entered the account and approximately $72,771.42 exited the account. The account was primarily funded by ATM/teller cash deposits in Michigan, New York, and Oklahoma, and from Zelle payments including those from **Subject Account 1** and from F.Z. The primary debits to the account included purchases from various airlines,

cashier's checks, and Zelle payments to accounts including **Subject Account 1** and STADLER).

On March 1, 2021, two separate cash transactions were debited to **Subject Account 3**, one in the amount of $4,000.00 and the other $1,200.00. On the same day, a cashier's check in the amount of $5,000.00 was withdrawn from the account made payable to S.W., whom law enforcement identified previously as having received money from NAIGANG via now-closed accounts. In April 2021, two separate cash deposits were made in the amounts of $9,000.00 and $3,960.00. Once the $3,960.00 was deposited, a cashier's check to Sun Title Agency was issued. A subsequent subpoena to the title company indicated it was for the earnest deposit on Property 6, which was later identified as an illegal marijuana grow. (*See* ¶ 25.)

On November 19, 2021, **Subject Account 3** received a $2,000.00 Zelle deposit from the account of Y.W. **Subject Account 3** then sent two separate $1,000.00 Zelle payments to **Subject Account 1** on the same day. On February 6, 2023, $1,800.00 in cash was deposited into **Subject Account 3** via an ATM in Oklahoma City, which was followed by Zelle payments to the accounts of A.A. for $800.00 and L.A. for $1,000.00. Based upon my training and experience, the activity in **Subject Account 3** is indicative of its use as a funnel account, where money is deposited in and soon after, taken out of the account. It is my belief that LYU is utilizing **Subject Account 3** to assist NAIGANG in laundering his illicit proceeds through cash deposits and moving the money through P2P payments, personal spending, and into real estate purchases.

**Subject Account 4** was opened at Bank of America on April 28, 2022, by LYU under the account name 274 Stirling, LLC. (*See* ¶¶ 38-46 for substance of activity.) Further, on December 27, 2022, a $5,000.00 cash was deposited into **Subject Account 4** in Oklahoma City, which was immediately followed by two Zelle payments to Deep Green Enterprises, LLC, a company that belongs to STADLER.

Based on the transactional activity in **Subject Account 4**, it is my belief that NAIGANG and LYU established the account for the sole purpose of laundering funds for the criminal organization. The funds that were used to purchase Property 10 came from businesses and individuals that have no known relationship with NAIGANG or LYU. Based upon my training and experience, I believe that **Subject Account 4** was also used to launder funds from known associates such as WALSH and to pay couriers such as STADLER.

**Subject Account 5** was opened at Bank of America on August 3, 2016, by NAIQING and L.L. From January 8, 2020, through February 22, 2023, approximately $283,493.71 entered the account and approximately $279,374.73 exited the account. The primary credits to the account came from ATM cash deposits in states such as New York, Oklahoma, and Michigan, counter credits from two individuals, the IRS Treasury Department, mobile deposits in the form of checks from various businesses, transfers from NAIQING's Bank of America savings account ending in 8887 (approximately $79,300), and Zelle payments from various known and unknown individuals and LLCs. The primary debits to the account occurred with ATM withdrawals in states such as New York, Michigan, and Oklahoma, checks to various individuals (to include C.Z.), payments to

Honda, teller cash withdrawals, payments to various credit cards, and Zelle payments to various individuals and businesses.

Examples of the transactional activity in the account are as follows: From July 1 to July 8, 2020, **Subject Account 5** received multiple Zelle payments from unknown individuals that totaled $5,900.00, followed by a $7,000.00 cash withdrawal in New York. On May 5, 2021, a $5,000.00 cash deposit was made into **Subject Account 5** in Grand Rapids, Michigan, which was in turn utilized to make payments to multiple credit cards and several Zelle payments. On June 21, 2021, a check from the Fifth Third Bank account of M.W. was deposited into the **Subject Account 5** in the amount of $30,000.00; however the check was subsequently returned due to lack of funds.[18] On August 15, 2022, **Subject Account 5** received a $30,000.00 transfer from NAIQING's savings account ending in 8887. The same day, **Subject Account 5** issued a check to a X.M.L. On August 16, 2022, **Subject Account 5** received a $40,000.00 transfer from NAIQING's savings account ending in 8887 and issued a check to L.L. It is my belief that NAIQING was utilizing his savings account as a layer of anonymity before depositing illicit funds into **Subject Account 5**.

On November 23, 2022, a check from S.N. in the amount of $15,000.00 was deposited into **Subject Account 5**. The memo on the check indicated "Bond Refund for

---

[18]     Law enforcement previously identified M.W. as a money courier and launderer for NAIGANG when in February of 2021, M.W. and Y.C. were stopped by the Indiana Highway Patrol for speeding on I-94. During a subsequent search of the vehicle, a vacuum-sealed bag was found under the spare tire in the trunk of their rental vehicle containing $69,500.00 in U.S. currency. M.W.'s phone number, (913) 549-6046 was found to have been in contact with NAIGANG's Phone A.

Z[.]W[.]." Database checks indicated that Z.W. was charged with acquiring proceeds from drug activity in the state of Oklahoma but that charges were subsequently dismissed on December 15, 2021.  Based on this, it is my belief that Z.W. is part of the criminal organization, as there would be no reason for NAIQING to receive a bond refund for Z.W.. On December 29, 2022, **Subject Account 5** received a $2,500.00 Zelle payment from P.C. That same day, a Zelle payment was sent from **Subject Account 5** to L. for $2,500.00. Subsequently, on December 30, 2022, a $300.00 Zelle payment was issued to **Subject Account 5** from P.C., and on the same day, a $300 Zelle payment was again sent to L.

Cash deposits that conceal the source of the funds, transfers from his savings account, and Zelle payments funding **Subject Account 5** are quickly sent out of the account to other individuals or for personal fund use.  Based upon my training and experience, I believe that NAIQING is utilizing **Subject Account 5** as a funnel account to launder money for the NAIGANG organization.

**Subject Account 6** was opened at JPMorgan Chase Bank on February 23, 2022, by NAIQING under the name JJ Gourmet Kitchen 168, LLC. From February 23, 2022, through February 1, 2023, approximately $516,064.00 entered the account and approximately $577,325.11 exited the account.  The suspected amount of illicit funds into the account is approximately $286,244.94.  Opening documents for **Subject Account 6** indicate that the listed address for JJ Gourmet Kitchen 168, LLC, is 1117 NW 25th Street, Oklahoma City, Oklahoma, which is the address for Private Kitchen.  It is my belief that JJ Gourmet Kitchen 168, LLC, is doing business as Private Kitchen.  The opening documents also indicate that the business of JJ Gourmet Kitchen 168 LLC was established in Oklahoma on February 16,

2022.  Based upon my training and experience, it is common for money launderers to establish LLCs, then open a corresponding bank account to launder funds and make them appear legitimate.  The opening of the account and incorporation of the business coincides with the approximate timeline of when NAIGANG moved to Oklahoma City.

Subject Account 6 is primarily funded in two ways: three cash deposits (approximately $280,182.47) and Merchant Bankcard transactions (approximately $229,819.06).  Investigators believe that the Merchant Bankcard transactions are a result of credit card transactions for individuals purchasing food at the restaurant, so that total is not included in the total amount of suspected illicit funds.  With regard to the cash deposits, however, on January 19, 2023, an associate of NAIGANG's, F.L., who was observed at Private Kitchen daily and resides at the 84th Street residence with NAIGANG and LYU, made two separate cash deposits at the same ATM into Subject Account 6 in the amounts of $1,980.00 and $1,020.00.  On January 20, 2023, two separate cash deposits were made into Subject Account 6 at the same ATM by LYU in the amounts of $3,200.00 and $1,820.00.  On February 3, 2023, LYU made a cash deposit into Subject Account 6 for $1,000.00.  The deposits on January 19, 2023, and January 20, 2023, appeared to be structured in nature as to avoid the bank reporting requirement of $10,000.00.  Another example of this practice occurred on August 1, 2022, where five ATM deposits into Subject Account 6 occurred on the same day in the amounts of $4,000.00; $3,700.00; $3,320.00; $2,960.00; and $2,000.00.  All of these amounts are under the reporting requirement and during the time the account has been open, the majority of cash deposits have been structured in this fashion.

Analysis of **Subject Account 6** indicates that debits to the account include credit card payments for DONG and other members of NAIGANG's family, to utility companies, checks to businesses with no apparent relationship to a restaurant in Oklahoma City; monthly rent checks to Oriental Group Investment; tax payments; ticket purchase from Southwest Airlines; and Zelle payments to known and unknown individuals and businesses – including $4,000.00 to BRANDON.  Debits from **Subject Account 6** also include checks issued from the account to individuals known to be associated with the organization, including one for $6,000.00 to N.P., a courier for the organization, likely in payment for delivery of marijuana, and well as $20,000.00 to W.Z., the previous owner of Property 1. **Subject Account 6** also issued checks in a cumulative amount of $41,925.00 to Z.W.C.'s Bank of America account.  Agents obtained financial records for Z.W.C.'s s account, which indicated that when checks from **Subject Account 6** were deposited into the account, Z.W.C. would use Zelle to transfer money to other individuals and to make payments to Canadian Valley Electric Company in Oklahoma.  A subpoena issued to Canadian Valley Electric for residences associated to the payments indicated that Z.W.C. was paying utilities for various grows in Oklahoma.

Based upon my training and experience, I believe that NAIQING established **Subject Account 6** for the NAIGANG's organization and that the account, as well as the restaurant, are being utilized as tools to launder the illicit funds from NAIGANG's criminal activities.  Although there appears to be some legitimate money into the account in the form of Merchant Bank payments, the amount of cash deposits into the account that appeared to be structured in nature, as well as the payments to various known and unknown individuals

that include a known courier for NAIGANG and an individual that is making payments for utilities at marijuana grows leads me to believe that **Subject Account 6** is being utilized to launder illicit funds.  It should also be noted that the amount exiting the account is higher than the amount entering the account, indicating no profit to the business.

**Subject Account 7** was opened at Huntington National Bank on August 16, 2021, by BRANDON.   From August 18, 2021, through February 14, 2023, approximately $143,026.70 entered the account (believed to be entirely illicit) and approximately $142,090.28 exited the account.  Financial analysis of **Subject Account 7** indicates that the primary credits to the account are cash deposits, online sports betting platforms such as DraftKings and BetMGM, and Zelle payments from known and unknown individuals.  The primary debits to the account are cash withdrawals, online sports betting platforms such as DraftKings and BetMGM, Venmo payments, and personal use spending such as rent and food.  The Zelle payments were received from **Subject Account 1, Subject Account 4, Subject Account 6,** and **Subject Account 8.**  In turn, BRANDON would utilize **Subject Account 7** to withdraw cash, make personal spending payments, or utilize the funds for online sports betting/gambling through DraftKings and BetMGM.  Based upon my training and experience with money laundering investigations, online sports gambling platforms have become a new conduit to launder illicit funds.  Many of the transactions indicate a deposit from an online sports gambling outlet which in turn will be deposited back into that online sports gambling outlet or a different company.  Given that most of the funds are cash deposits that cannot be traced, as well as P2P payments from other **Subject Accounts,** coupled with the information that BRANDON has no known source of legitimate income,

it is my belief that BRANDON is using **Subject Account 7** as a way to launder funds for NAIGANG's criminal organization and then in turn utilize the funds for personal spending.

**Subject Account 8** was opened at Bank of America on June 27, 2015, by BRANDON.   From December 18, 2018, trough January 19, 2023, approximately $568,560.78 (believed to be entirely illicit) entered the account and approximately $569,326.67 exited the account.   Although **Subject Account 8** is under BRANDON's name, an examination of BRANDON's phone by border officials in November 2022 revealed conversations between BRANDON and his brother NAIYANG that suggest they both have access to the account and are sharing its passcode.  The primary credits to the account are cash deposits in multiple states where NAIGANG's criminal organization operates, including Florida, Oklahoma, and Michigan, as well as P2P payments from PayPal and Zelle.  At least 50 different entities have sent Zelle payments to **Subject Account 8**. The primary debits to the account are in the form of cash withdrawals in Michigan, Oklahoma, and Colorado, Zelle payments, Apple cash payments, Western Union payments, casinos, credit card payments, and cryptocurrency platforms such as Cryptohub and Robinhood.

**Subject Account 8** received payments from **Subject Account 1**, **Subject Account 6**, and **Subject Account 14**. The account also received a check from **Subject Account 16**. On November 7, 2022, a check from the People's Electric Cooperative, a utility company in Oklahoma, was deposited into the account.  A copy of the check indicated that it was addressed to NAIYANG and endorsed by BRANDON.  The address listed for NAIYANG was 18609 County Road 1580, Ada, Oklahoma.  Law enforcement database checks indicate

that this address was identified as a non-registered marijuana grow in 2022 when NAIYANG's name was on the utilities for the property.

Funds from **Subject 8** were also transferred via Zelle to other accounts, including **Subject Account 1** and **Subject Account 14**, as well as to an entity named Turtlecreek.[19] The funds were also spent at various casinos, through Western Union payments, and via credit cards held by BRANDON and NAIYANG. One credit card account ending in 4391 indicates purchases in Oklahoma City to Grow Generation (a known marijuana grow supply store) and Probox Portable Storage. It should be noted that agents have observed NAIYANG at a warehouse located at 1825 SE 66th Street, Oklahoma City, Oklahoma on a daily basis. Agents have observed two Probox Connex boxes in front of the warehouse and have observed NAIYANG with YANG and DONG retrieving marijuana grow supplies from these Connex boxes. On March 10, 2023, agents observed a pickup truck arrive pulling a large trailer, which backed up to the warehouse. The driver and NAIYANG then began carrying marijuana plants from the trailer into the warehouse. According to state law enforcement records, this location is not a registered marijuana grow.

Based upon my training and experience, I believe that **Subject Account 8** is being utilized by BRANDON and NAIYANG to launder illicit proceeds for NAIGANG's criminal organization. P2P payment systems, casinos, cryptocurrency, and cash deposits/withdrawals, all are methods used to launder and conceal the source of the funding.

---

[19]     Property 8 is located on a street named Turtlecreek in East Lansing, Michigan. In February 2022, law enforcement executed a search warrant at Property 8 and discovered an illegal marijuana grow there.

The funds are also used to pay credit cards that are used for purchasing supplies to maintain illegal marijuana grows under the control of NAIGANG's organization.

**Subject Account 9** was opened at Bank of America on January 30, 2012, by XIE. From December 24, 2018, through February 28, 2023, approximately $220,603.21 entered the account and approximately $240,923.00 exited the account. **Subject Account 9** is primary funded by cash deposits, check deposits, and Coinbase deposits. The primary debits to the account are transfers to **Subject Account 10** and a return item chargeback in the amount of $60,000.00. The following are the transactions that primarily funded the account and were debited to the account:

a. On August 7, 2020, $6,200.00 cash was deposited into **Subject Account 9** at an ATM in Grand Rapids, Michigan. Video surveillance shows XIE removing the currency from a USPS envelope. This was followed by a transfer of $5,200.16 from **Subject Account 9** to **Subject Account 10**. XIE then moved the money to a now closed Chase account. (*See* ¶ 79.)

b. On December 19, 2020, $1,440.00 cash was deposited into **Subject Account 9** in Wyoming, Michigan.

c. On July 19, 2021, a $60,000.00 check from XIE that originated from his now closed personal checking account ending in 5718 at Chase was deposited into **Subject Account 9**. The $60,000 was then sent back to Chase Bank in a return item chargeback.

d. On July 23, 2021, a cashier's check from XIE's Chase Bank account for $64,989.68 was deposited into **Subject Account 9**. XIE then transferred $68,500 to **Subject Account 10** where it was used in a $100,000 wire to Chicago Title Company for the purchase of his residence at 8421 NE 122nd Street, Kirkland, Washington.

e.    From October 18, 2021, to November 1, 2021, XIE deposited a $20,000.00 check issued from his Citibank account ending in 5479.[20] XIE also made four separate Coinbase deposits into **Subject Account 9** in the amounts of $4,925.50; $6,895.70; $9,976.00; and $20,000.00 during this time period.  XIE then transferred $50,000.00 to **Subject Account 10** and $6,000.00 to an unknown brokerage account.

f.    On November 5, 2021, **Subject Account 9** received a $5,632.39 deposit from Coinbase.

g.    The remaining transactions were four transfers to **Subject Account 10**, a Coinbase transaction, and an ATM deposit in New York.

Based upon my training and experience, I believe that **Subject Account 9** shows activity of being a funnel account where money is deposited into but then sent out to other accounts owned by XIE in an apparent attempt to conceal the origins of the funds, as there is no legitimate reason to deposit into this account rather than the final destination account. Also, **Subject Account 9** received deposits from Coinbase, which I know from training and experience can be used as an investment tool but is also used as a tool to launder funds due to the layers of concealment cryptocurrency can provide.

**Subject Account 10** was opened at Bank of America on January 30, 2012, by XIE. From December 18, 2018, through March 24, 2023, approximately $1,083,696.05 entered the account and approximately $1,053,815.92 exited the account.  The primary deposits into the account are ATM cash deposits, checks from various known and unknown individuals, transfers from **Subject Account 9**, P2P services such as Venmo and Zelle, ACH and wire transfers.  **Subject Account 10** also received payments from Robinhood and payroll

---

[20]    Analysis of this account indicates the funds originated from XIE's Acorns investing account, however the funds used to invest into the Acorns account came from Zelle payments from various individuals and cash deposits.

deposits from We Work and Amazon, none of which are included in the calculation of

suspected illicit funds. The primary debits to the account are P2P payments to various

individuals, wire and ACH transfers, and payments to credit cards. Financial analysis of

the account indicates that XIE was co-mingling his legitimate and suspected illegitimate

funds in an effort to finance marijuana grows by moving money to individuals known and

individuals suspected of helping XIE purchase and operate these illegal grows. The

following are examples of transactions indicative of money laundering through the account:

a.   On, July 12, 2019, two structured cash deposits were made into **Subject Account 10** in New York City for the amounts of $3,450.00 and $3,400.00. XIE then issued a check to X. for $5,000.00 and paid $3,896.10 to a Chase Bank credit card.

b.   On February 10, 2020, $50,000.00 was deposited into **Subject Account 10** from Robinhood, which XIE then used to issue a check to himself. The funds were then deposited into XIE's Chase Bank checking account ending in 5718 (now closed). From there, XIE used the money to issue a check to M.W. and Newman, LLC, which indicated a down payment for an address, but unfortunately the address was not legible on the check.

c.   On June 25, 2020, **Subject Account 10** received two Zelle payments, each $2,000.00 from Q.W. (*See* ¶20 regarding Q.W.'s involvement in the purchase of Property 2.) Once XIE received the two Zelle payments, he sent a Zelle payment to a H.L. for $2,803.27, a PayPal payment to an unknown person for $3,822.14, and a Venmo payment to an unknown person for $2,000.00.

d.   On August 1, 2020, $3,900.00 cash was deposited into **Subject Account 10** at an ATM in Long Island, New York. Video surveillance shows XIE and a female, believed to be his wife, pulling U.S. currency from a shopping bag to make the deposit. On August 7, 2020, two ATM cash deposits for $2,000.00 each were made into **Subject Account 10** in Grand Rapids, Michigan. Video surveillance shows XIE pulling the currency from a USPS envelope to make the deposit. XIE also deposited $6,200.00 into **Subject Account 9** at this ATM which he then transferred $5,200.15 of that deposit from **Subject Account 9** to **Subject Account 10** on August 20, 2020. All these cash

deposits where then used to issue a $20,000.00 check which was deposited into XIE's now closed Feilos Holding business account at Chase Bank ending in 1956. These funds, along with multiple other large deposits into the 1956 account were then moved in a $245,000.00 transfer to XIE's Chase Bank account ending in 5718. Once the funds were in that Chase account, XIE sent the money back to **Subject Account 10** in two transfers of $100,000.00 each on September 4, 2020, and September 8, 2020.

e.   On July 21, 2021, **Subject Account 10** received an international wire from W.Z. in China which indicated the note "deduct living expense." These funds were used to make several credit card payments but also to send a $5,000.00 ACH transfer to a B.H. and a $20,000.00 ACH transfer to S.C.

These transactions are only several examples of the many transactions in the account that indicate the laundering of funds. XIE consistently used **Subject Account 10** as a funnel account to transfer funds between accounts XIE held at other institutions. Based upon my training and experience, there is no legitimate reason that XIE needed to move the large sums of money through various accounts other than to conceal the funds origins in an attempt to "clean" the funds.

**Subject Account 11** was opened at KeyBank on May 11, 2022, by XIE under the business name Feilos Holdings, LLC. From May 11, 2022, through January 6, 2023, approximately $228,664.89 entered the account and approximately $225,715.82 exited the account. Financial analysis of the account indicates that the account is primarily funded by wires from various individuals and entities with no known association to XIE, checks from various LLCs, and direct deposits from Intuit (the deposits from Intuit are not included in the suspected illicit funds). The primary debits to the account are checks to various known and unknown individuals, credit card payments, and wire transfers.

Examples of suspected illicit funds being laundered through the account are as follows:

a.   On June 6, 2022, and June 8, 2022, two check deposits from Origin Capital, LLC, in the amounts of $2,000.00 and $20,000.00 were deposited into **Subject Account 11**. The following month, **Subject Account 11** issued multiple checks over a several-day period to three individuals: $1,500.00 to X.P. (indicating that the check was for "Design Service for Mininghouse #1"); a $10,000.00 check to K.K.C. (for "the Project La Salle Renovation"); and a $1,086.87 check to Z. (for "Mininghouse reimbursement"). K.K.C. was previously identified through financial analysis of YANG's now-closed Oriental Asian Buffet PNC Bank account. In that account, on April 22, 2020, YANG sent a $8,000.00 wire to K.K.C. Photos from XIE's computer indicate a large marijuana grow at the La Salle Residence.

b.   In August and September 2022, a $50,000.00 wire from TJ Transport (located in Fresh Meadows, New York) and a $50,000.00 wire from Z.L. (who resides in New York, New York) entered **Subject Account 11**. On two consecutive days, a check deposit for $2,106.81 from Origin Capital, LLC, and then a $15,000.00 wire from Origin Capital, LLC (based on wire details is located in Long Island City, NY) entered **Subject Account 11**. **Subject Account 11** then issued two checks to a G.H.X. and Z.L., along with a $61,258.83 wire to G.X. Two credit card payments totaling over $25,000 were also debited to **Subject Account 11**.

c.   In October 2022, **Subject Account 11** issued a $10,000.00 check to K.K.C. was issued for Capital Improvement La Salle (referring to the grow at the La Salle address) and then **Subject Account 11** received two wire transfers on the same day in the amounts of $15,000.00 (from X.X.) and $35,000.00 (from G.X.). Once the wires were received, the following debits occurred from **Subject Account 11**: a $4,966.58 check to Michael's Toyota for the purchase of a 2022 Toyota Sierra; $21,980.30 to American Express credit cards; a $9,120 wire to Grow Lighting in Dover, Delaware; and two checks to Miao Yang for a total amount of $6,666.00 (referencing "the Cloud Nine Project").

d.   On November 23, 2022, a wire from **Subject Account 11** was issued to Jack's Custom Building Remodeling for $6,000.00, which referenced Project Sunset Remodeling Down Payment. On January 5, 2023, a $6,000.00 check from **Subject Account 11** to Jack's Custom

Building Remodeling was issued referencing "Sunset Renovation Payment 2." These payments for remodeling reference Property 3, located on Sunset Avenue in Lansing, Michigan, where law enforcement discovered an illegal marijuana grow.

Based upon my training and experience, it is my belief that XIE is utilizing **Subject Account 11** to launder illicit funds obtained from various marijuana grows that he owns in some capacity. Wires and checks to various individuals and businesses are referencing known marijuana grows and it appears that XIE is attempting to conceal the true nature of these credits and debits by naming the marijuana grows as "Projects." Documents on XIE's computer indicate that XIE is a financier of marijuana grows.

**Subject Account 12** was opened at JPMorgan Chase Bank on March 28, 2022, by WALSH. From March 28, 2022, through January 13, 2023, approximately $126,297.49 entered the account and approximately $126,578.20 exited the account. (*See* ¶¶ 44-49 for substance of activity.) The account was funded primarily by cash deposits in various states such as California, Michigan, Oklahoma, Florida, Georgia, and Maryland, all locations to which where NAIGANG is known to distribute. The primary debits to the account reflect travel that WALSH did to include payments to hotels, restaurants, and gas stations in various states to or through which WALSH traveled based upon the GPS location information agents recovered on WALSH's phone. Also, I believe based upon my training and experience, that based upon the total amounts credited and debited to the account, the account represents a funnel account used solely for depositing proceeds and travel payments and expenses incurred while serving as a courier for NAIGANG.

**Subject Account 13** was opened at Bank of America on June 17, 2022, by WALSH. From June 17, 2022, 2018 to September 8, 2022, approximately $31,500.00 entered the account and approximately $31,475.00 exited the account. The investigation indicates that **Subject Account 13** was opened solely for the purpose of laundering funds for NAIGANG's criminal organization. The day **Subject Account 13** was opened, three separate cash deposits were made into it in Oklahoma City for a total of $31,500.00. Over the next several days, multiple Zelle payments were made to **Subject Account 12**, and then a $20,000.00 teller transfer was made in North Carolina and transferred to LYU's **Subject Account 4**. (*See* ¶ 44.) After the teller transfer, three more Zelle payments were made to **Subject Account 12**. Based upon my training and experience, I believe that these were payments for WALSH transporting marijuana for NAIGANG.

**Subject Account 14** was opened at Bank of America on June 28, 2021, by HARROLD. From March 30, 2022, to February 22, 2023, approximately $62,339.66 entered the account and approximately $64,021.56 exited the account. The primary credits into **Subject Account 14** are in the form of cash deposits, transfers from **Subject Account 15**, checks from Pro Move and Install, Inc. (believed to be legitimate income and therefore not incorporated in the total amount of suspected illicit funds) and Zelle payments. Financial analysis indicates that the majority of the Zelle payments came from BRANDON's **Subject Account 8**. In January 2022, HARROLD was stopped by state law enforcement after traveling to several known marijuana stash houses operated by NAIGANG. During the stop, law enforcement seized approximately 57 pounds of marijuana from HARROLD's vehicle. During a subsequent forensic examination of

HARROLD's phone, it was discovered that HARROLD had also transported marijuana on NAIGANG's behalf to Illinois. Based upon my training and experience, I believe that these Zelle payments and cash deposits are payments for transporting marijuana for NAIGANG.

The primary debits to the account indicate teller transfers to accounts owned by unknown individuals, casinos, credit cards, and Zelle payments to unknown individuals. A further analysis of **Subject Account 14** indicates there are purchases in other states such as Ohio, Indiana, and Georgia, all locations where either NAIGANG conducts business or that known couriers travel through while transporting marijuana. It is my belief that HARROLD is utilizing **Subject Account 14** to launder proceeds from NAIGANG's marijuana business with the majority of the deposits being in the form of cash or P2P payments, which is a way that launderers conceal the source of funds. HARROLD in turn will then use the funds to either transfer to accounts, send money via Zelle, or utilize the funds for personal spending or to fund trips as a courier for NAIGANG.

**Subject Account 15** was opened at Bank of America on June 28, 2021, by HARROLD. From March 31, 2022, through October 11, 2022, approximately $2,650.00 entered the account and approximately $1,575.54 exited the account. The suspected amount of illicit funds into the account is approximately $1,400.00. **Subject Account 15** was primarily funded by $1,300.00 in cash deposits; a $100.00 transfer from **Subject Account 14;** and $1,250.00 from Pro Move and Install, Inc. (believed to be legitimate, therefore not included in the suspected illicit funds). The primary debits from **Subject Account 15** are to casino, payment to a credit card, transfers to **Subject Account 14,** and an ATM withdrawal. Due to the deposit of cash from an unknown source and the movement of

money from **Subject Account 14**, I believed that proceeds from the transportation of marijuana were deposited into **Subject Account 15** either through the cash deposits or from **Subject Account 14** as payment for HARROLD's services as a courier for NAIGANG.

      **Subject Account 16** was opened at Huntington National Bank on November 16, 2020, by YANG.  From November 16, 2020, through January 31, 2023, approximately $26,054.68 entered the account and approximately $25,036.79 exited the account.  The suspected amount of illicit funds into the account is approximately $39,158.84.

      The investigation revealed that YANG and DONG worked with NAIGANG in his criminal organization. (*See* ¶ 30, for example.)  Specifically, YANG assisted in running the illegal marijuana grow operation at Property 2 and DONG received the processed marijuana at Property 1.  YANG was also involved in laundering funds for the organization through a PNC Bank account ending in 5372 under the name Oriental Asian Buffet, including through the transfer of international wires to and from China, by sending money to XIE, and by making large cash deposits, which were used to fund the purchase of Property 4 and the earnest money deposit for Property 2.  On January 18, 2023, the PNC account was closed and a cashier's check in the amount of $1,830.74 was issued at closing.  This cashier's check was then deposited in **Subject Account 16**.  At the opening of **Subject Account 16**, cash was deposited into the account along with two separate checks from the PNC account.  The remainder of the credits to the account were checks from food delivery services such as Grubhub and Beyondmenu.com (neither are included in the suspected illicit funds), checks from an unemployment agency (not included in suspected illicit funds) and a check from The Hartford, a financial services firm.  In turn, the funds deposited into **Subject Account**

16 were used to make payments to New York Life Insurance, issue checks to various individuals, make purchases at multiple hydroponic supply stores, make credit card payments, for personal spending, and for a check for $1,000.00 issued to Bellaby Realty for the purchase of Property 7.

It is my belief, that based on YANG's involvement in the establishment of illegal marijuana grows and the distribution of that marijuana, that YANG was and is utilizing her business account for Oriental Asian Buffet to launder the illicit proceeds for NAIGANG, which she then uses to help NAIGANG purchase real estate to conceal the true source of the funds. During the search warrant of Property 2, the Mexican national farmer interviewed further advised that he used to work at Oriental Asian Buffet until it closed due to the COVID-19 pandemic in spring 2020. Almost all of the funds in both the PNC account and **Subject Account 16** entered after the business was closed – and it remains closed to at present.

Due to the results of financial analyses on accounts associated with NAIGANG, NAIYANG, BRANDON, and XIE, indicating that they were making deposits to and receiving deposits from Coinbase, on March 17, 2023, agents submitted a subpoena to Coinbase for account information. The results indicated that several Coinbase accounts exist held by the above-named individuals.

**Subject Account 17** was created at Coinbase on June 28, 2015, and is owned by BRANDON. According to documents provided by Coinbase, the account funding **Subject Account 17** is **Subject Account 8**. The documents also indicate that BRANDON's total transaction with Bitcoin accumulated to $239,171.80 since the establishment of the account.

BRANDON did not deposit or withdraw any Bitcoin from **Subject Account 17** (i.e., convert U.S. dollars to Bitcoin or vice versa). **Subject Account 17**, however, did receive $150,189.20 worth of Bitcoin and remitted $88,982.57 worth of Bitcoin, all of which occurred within the Coinbase platform. Based on the analysis of **Subject Account 8**, which was used to fund **Subject Account 17**, I believe that BRANDON utilized **Subject Account 17** to launder illicit proceeds for the NAIGANG criminal organization. Based upon my training and experience with financial investigations, cryptocurrency – in particular Bitcoin – is utilized by money launderers because it provides levels of anonymity that the standard banking system does not.

  **Subject Account 18** was created on December 5, 2017, and is owned by XIE. According to documents provided by Coinbase, the account funding **Subject Account 18** is **Subject Account 9**. The documents also indicated that the total amount of cryptocurrency sent and received by XIE are $1,819.93 in Ethereum, $18,028.14 in Bitcoin, $35,608.29 in USDC, and $3,248.95 in USDT. I believe that XIE was utilizing Coinbase to send and receive illicit funds from the sale of marijuana, which included transactions involving **Subject Account 9**. (*See* ¶ 76.)

  **Subject Account 19** was created on May 10, 2021, and is owned by NAIGANG. According to documents provided by Coinbase, the account funding **Subject Account 19** is a Huntington Bank account ending in 5463. Documents from Coinbase indicate that **Subject Account 19** engaged in a total of $12,484.79 in transactions since the establishment of the account. NAIGANG never bought or sold any cryptocurrency and only sent and received Bitcoin in the account. Based upon my training and experience, I believe that

NAIGANG was utilizing **Subject Account 19** to launder illicit funds from his criminal organization and to send and receive payments related to his criminal activity.

**Subject Account 20** indicates consistent betting beginning in January of 2021 to March 2023 (the end date of financial documents obtained by investigators). The account is owned by BRANDON and based on financial analysis of **Subject Account 7**, he has sent or received money to and from BetMGM in the total sum of $10,323.48. Since BRANDON does not have any reported legitimate income, the money being sent to **Subject Account 20** is suspected to be illicit funds from the criminal organization. Financial analysis of **Subject Account 7** indicates that BRANDON is laundering illicit funds through his online gambling account. For example, YANG made a $1,000.00 deposit into **Subject Account 7** on August 12, 2022; BRANDON sent $560.00 to BetMGM the same day. On August 16, 2022, BRANDON received $710.00 into **Subject Account 7** from **Subject Account 22** and then sent $675.00 back to **Subject Account 22**. On August 17, 2022, and August 18, 2022, funds from **Subject Account 20** in the amounts $1,025.00 and $1,100.00, respectively, were deposited into **Subject Account 7**. Based upon my training and experience, BRANDON would have no legitimate reason to receive funds into one account and then send almost the same amount back to another account, only to pull out higher amounts several days later. This is indicative of money laundering and attempting to conceal the origin of the illicit funds – specifically as it relates to **Subject Account 20**.

**Subject Account 21** was created on October 4, 2018, by BRANDON under the username "Dragonbonus95." **Subject Account 21** is funded by **Subject Account 7**, which is in turn primarily funded by cash deposits, DraftKings deposits, and P2P deposits. In total,

$26,030.00 was remitted from **Subject Account 7** to DraftKings and $29,777.50 was deposited into **Subject Account 7** from DraftKings.

Analysis of the credits and debits from **Subject Account 21** into **Subject Account 7** indicates an abnormal pattern of deposits and debits. For example, on December 9, 2022, **Subject Account 21** deposited $1,000.00 into **Subject Account 7**. The same day, $785.00 was sent back to **Subject Account 7**. On December 27, 2022, $400.00 from **Subject Account 21** was deposited into **Subject Account 7** and then multiple payments of $110.00, $100.00, and $220.00 were sent back to **Subject Account 21**. Based upon my training and experience, this is abnormal activity for an online gambling account as there is no reason to take money out of **Subject Account 21** only to send it immediately back to the same account. This is a tactic used by money launderers to conceal the true origin of funds. Further, while I believe that BRANDON is also utilizing **Subject Account 21** for actual gambling, the funds utilized to do so are suspected illicit funds from NAIGANG's marijuana grow operation.

## SUBJECT VEHICLES

On December 20, 2021, law enforcement conducting surveillance at Property 3 observed **Subject Vehicle 1** exit the building and travel to the Hamlet Circle Residence, a location at which NAIGANG was known to reside periodically. Once the vehicle departed the Hamlet Circle Residence, it began traveling to Grand Rapids, Michigan, where it was stopped by state law enforcement. The occupants of the vehicle were identified as C.Z. and F.Z., known associates of NAIGANG. After the traffic stop, the vehicle traveled to Grow Generation in Grand Rapids, Michigan. Through analysis of financial records, agents know

that NAIGANG's associates purchase marijuana cultivation supplies for their grows at Grow Generation.

On February 19, 2023, a pole camera at the Sanabel Residence indicated that at **Subject Vehicle 1** arrived at the residence and backed into the driveway. XIAO and CHEN, the driver and front seat passenger, respectively, exited the vehicle and unloaded approximately four large black trash bags from the back of **Subject Vehicle 1**, as well as several boxes. XIAO and CHEN then closed the door to the vehicle and walked inside. Based upon my training and experience, I believe that the bags and boxes contained marijuana that XIAO and CHEN transported for NAIGANG's organization to the Sanabel Residence.

On August 5, 2021, law enforcement conducted surveillance of NAIGANG as he traveled in **Subject Vehicle 2** from Property 1 to Property 8, then to the residence of an associate, where he retrieved a large trash bag. (*See* ¶ 28 for the substance of this incident involving **Subject Vehicle 2**.) Based upon my training and experience, I believe that NAIGANG utilized **Subject Vehicle 2** to transport illegal marijuana contained in a large trash bag in furtherance of his criminal organization.

Law enforcement first encountered **Subject Vehicle 3** on March 17, 2021, when it was observed at Property 5.[21] Later that day, **Subject Vehicle 3** was observed at Property 1. It has remained there but is now registered to Y.L., who has been identified as either the wife or ex-wife of NAIGANG. Financial records for Y.L. do not indicate any type of

---

[21] At the time, Subject Vehicle 3 displayed a Colorado license plate (QBZ489) registered to M.H.

payroll or employment income.  Agents obtained wage and earnings for Y.L. through the state of Michigan, which indicate that she has not claimed any income since March 2020. Analysis of her Bank of America account ending in 5435 indicates that the account is solely funded by cash deposits – some of which appear to be structured in nature -- and by deposits from Zelle and CashApp.  Based upon my training and experience, I believe that **Subject Vehicle 3** was purchased utilizing illicit proceeds from the sale of marijuana by NAIGANG.

On February 21, 2023, U.S. Magistrate Judge Suzanne Mitchell signed a GPS tracking warrant for **Subject Vehicle 4**.  On February 23, 2023, agents installed the GPS tracking device on the vehicle while it was parked at NAIGANG's residence at 8117 NW 84th Street, Oklahoma City, Oklahoma.  Later that day, **Subject Vehicle 4** traveled to a warehouse located at 1825 SE 66th Street, Oklahoma City, Oklahoma ("the 66th Street address").  On March 7, 2023, a pole camera was installed on the location.  Since that time, NAIYANG, utilizing **Subject Vehicle 4,** has arrived at this location on a daily basis.

On March 10, 2023, surveillance of the 66th Street address showed that NAIYANG and **Subject Vehicle 4** were present at the warehouse when a Texas-plated pickup pulling a large trailer arrived and backed up to the warehouse.  For approximately 30 minutes, NAIYANG and the driver of the pickup unloaded marijuana plants from the trailer into the warehouse.  State law enforcement database checks indicate that the 66th Street address is not a registered or licensed marijuana grow.

On March 13, 2023, surveillance of the 66th Street address indicated that NAIYANG exited the building carrying a medium-sized box which he put in the trunk of **Subject Vehicle 4**.  NAIYANG then returned to the building and obtained what appeared to be either

white boxes or bags and put them in the trunk of the vehicle. I believe that NAIYAING is utilizing **Subject Vehicle 4** to operate an illegal marijuana grow and is transporting grow supplies and processed marijuana in **Subject Vehicle 4**.

**Subject Vehicle 5** is typically parked at the Sanabel residence, which has been identified as a marijuana stash house used by NAIGANG's organization. NAIGANG, CHEN, and XIAO use **Subject Vehicle 5** regularly in patterns indicative of loading and unloading marijuana. For example, on February 2, 2023, GPS location information on Phone B indicated that NAIGANG was in the area of Property 1. Agents observed NAIGANG exit the residence and depart in a white Toyota Camry bearing Michigan license plate DFF2703 (registered to BRANDON). While conducting surveillance, agents observed NAIGANG meet with CHEN (traveling in **Subject Vehicle 5**) at a Vietnamese restaurant in Grand Rapids, Michigan. Once both parties departed (CHEN in **Subject Vehicle 5**), agents followed NAIGANG back to Property 1. Upon arrival, agents observed CHEN and **Subject Vehicle 5** in the driveway. Both NAIGANG and CHEN then entered the residence and exited several minutes later carrying a large black trash bag which they placed into the trunk of **Subject Vehicle 5**. Both NAIGANG and CHEN then departed in **Subject Vehicle 5** and drove to Property 4, where they parked in the back of the building. Due to the location, agents were unable to obtain surveillance of NAIGANG and CHEN while they were behind the building but observed a blue Dodge Ram leave the area when NAIGANG and CHEN departed in **Subject Vehicle 5** before traveling back to Property 1. Once back at Property 1, agents observed NAIGANG and CHEN place several more large trash bags in the trunk of **Subject Vehicle 5** and then depart. Agents had to discontinue

surveillance after this point.  Based upon my training and experience, I believe that NAIGANG and CHEN used **Subject Vehicle 5** to transport trash bags containing marijuana in furtherance of the organization's criminal activities.

Records from LYU's JPMorgan Chase Bank account demonstrate the on October 22, 2022, she and CHEN purchased **Subject Vehicle 6** through Mercedes-Benz of Oklahoma City.  According to the loan documents, LYU and CHEN both listed their addresses as 8117 NW 84th Street, Oklahoma City, Oklahoma – the residence that they share with NAIGANG – and LYU listed her phone number as Phone B – NAIGANG's phone number.  The sale price of the vehicle was $73,650.00, and LYU and CHEN put down $25,200 in cash.  They both identified Private Kitchen as their employer; LYU listed herself as a general manager, stating that she makes $7,500.00 monthly while CHEN listed himself as a manager with a $75,000.00 annual salary.  Law enforcement obtained wage and earning information for LYU and CHEN and determined that neither have ever reported any wages through the state of Oklahoma.  Based on my training, experience, and knowledge of the investigation, I believe that CHEN and LYU used illicit proceeds from the production and distribution of marijuana as a cash down payment for **Subject Vehicle 6**, which they tried to conceal on the loan documents.  (*See* ¶¶ 50-53 regarding the stop on the **Subject Vehicle 6** on February 13, 2023.)

Through the course of the investigation, agents identified **Subject Vehicle 7** as typically present at the Sanabel Residence and utilized by XIAO.  On multiple occasions, XIAO has been observed removing boxes from the **Subject Vehicle 7**  and bringing them into the residence.  For example, on February 28, 2023, **Subject Vehicle 7** departed the

Sanabel residence and traveled to a suspected marijuana stash location located off Melrose Lane just to the east of Rockwell Avenue in Oklahoma City. The exact address of the building is unknown as the building is non-descript and sits behind several other commercial buildings. After remaining at the building for approximately an hour and 15 minutes, the **Subject Vehicle 7** returned to the Sanabel Residence where XIAO and CHEN exited – CHEN carrying a box inside from **Subject Vehicle 7** into the residence. Based upon my training and experience, I believe that this box transported in **Subject Vehicle 7** contained illegal marijuana.

On March 17, 2023, XIAO departed the Sanabel Residence in **Subject Vehicle 7** and traveled to a Home Depot. Upon his return to the Sanabel residence, XIAO unloaded multiple collapsed Home Depot moving boxes and carried them into the residence. Throughout the day, several vehicles arrived at the Sanabel Residence. Sometimes the vehicles backed into the driveway, where they were then loaded with multiple Home Depot boxes (now put together and sealed). Other times, the vehicles arrived but did not back into the driveway, at which time XIAO would bring out a sealed Home Depot box and place it into the vehicle's trunk. During the course of this investigation, agents have observed members of this organization specifically using moving boxes from Home Depot. Based upon my training and experience, I believe that the boxes transported in **Subject Vehicle 7** were used to transport marijuana illegally.

On January 24, 2023, agents observed STADLER, in **Subject Vehicle 8,** arrive at the Sanabel Residence. He left, but returned later in the day, again in **Subject Vehicle 8,** which he back into the garage for approximately 14 minutes before departing. Previously,

in April 2022, STADLER was arrested in West Virginia transporting 430 pounds of marijuana in a van registered to NAIQUING.[22] (*See* ¶ 44.) GPS phone location information on STADLER's Phone C indicates that he left the Sanabel Residence in Oklahoma City in **Subject Vehicle 8** and traveled to Duluth, Georgia – a route that this investigation has revealed has been traveled previously by other couriers for NAIGANG's organization including WALSH and ALLEN. Based upon my training and experience, I believe that STALDER loaded illegal marijuana into **Subject Vehicle 8** at the Sanabel Residence, then used **Subject Vehicle 8** to transport it from Oklahoma City to Georgia at NAIGANG's behest.

Previously, on March 27, 2022, a GPS tracking device affixed to **Subject Vehicle 10** indicated that it was traveling to Oklahoma City from Los Angeles, California. Law enforcement established surveillance on **Subject Vehicle 10** as it entered Oklahoma City and determined that STADLER was driving – and pulling a large trailer bearing Michigan license plate E644101 (registered to STADLER). They followed as **Subject Vehicle 10** traveled to SpareBox Storage located at 2409 North Sara Road, Yukon, Oklahoma. After entering the facility, STADLER parked in front of a unit and opened the trailer, which agents observed to be completely full of Home Depot boxes. STADLER unloaded the boxes into the storage unit, then drove to Private Kitchen, where he met with NAIGANG.

---

[22]   STADLER was charged with, and subsequently entered a plea of guilty to possessing with intent to distribute 100 or more kilograms of marijuana, in violation of 21 U.S.C. § 841(a)(1), in United States District Court for the Northern District of West Virginia. STADLER is currently out of custody on conditions of pretrial release and is being supervised by U.S. Probation in the Western District of Michigan as he awaits a sentencing date.

Later, it was determined that **Subject Vehicle 10**'s last stop outside of Los Angeles was a location with multiple outdoor greenhouses. Based on my training and experience, as well as previous seizures in this investigation, I believe that STADLER utilized **Subject Vehicle 10** to transport illegal marijuana for NAIGANG's criminal organization.

## CONCLUSION

33.      Based on the foregoing facts and circumstances, I believe there is probable cause to believe that NAIGANG and his associates have violated 18 U.S.C. §§ 1956 and 1957 (money laundering) as well as 21 U.S.C. § 841 (manufacture and distribution of drugs) and 21 U.S.C. § 846 (drug conspiracy), through the operation of illegal marijuana grows, coordination of the distribution of marijuana, and the concealment of proceeds therefrom through the banking system and the purchase of assets. The investigation has revealed that the conspiracy and criminal conduct described above continued through at least May 8, 2023, and occurred at least in part, within the Western District of Oklahoma. Consequently, there is probable cause to believe that **Subject Accounts** and **Subject Vehicles** are subject to seizure pursuant to 18 U.S.C. § 981(b) and 28 U.S.C. 2461(c), as incorporated by 21 U.S.C. § 881(b), 18 U.S.C. § 981(a)(1)(A) and (a)(1)(C); 18 U.S.C. § 982(a)(1) and 21 U.S.C. § 853(f), as incorporated by 18 U.S.C. § 982(b)(1), for violations of 21 U.S.C. §§ 841 and 846; 881(a)(4) and 881(a)(6); and 18 U.S.C. §§ 1956 and 1957.

34.      Therefore, it is requested that the HSI or the United States Attorney's Office be authorized to effect the seizure of the contents of the bank accounts by directing the financial institutions to do any of the following:

a.   to freeze the contents of the accounts in place and to refuse the withdrawal of any amount from the account by anyone other than HSI or the United States Attorney's Office and while the contents of the accounts are frozen in place, to allow them to continue to accrue any deposits, interest, dividends, and any other credits until the HSI or the United States Attorney's Office directs that the contents of the account be finally liquidated and no contents remain; and

b.   to liquidate some or all of the contents of the accounts at one or more times and upon any liquidation of any contents, turn over the cash value of the liquidated contents to the HSI.

**FURTHER THE AFFIANT SAYETH NOT.**

I declare under penalty of perjury that the foregoing is true and correct this 9th day of May, 2023.

Special Agent Josh Reinsch
Homeland Security Investigations (HSI)

Subscribed and sworn to before me this _9th_ day of May, 2023.

SHON T. ERWIN
United States Magistrate Judge